Bush, &c., v. Lisle, &c.

CASE 59—CONTESTED WILL—DECEMBER 17.

# Bush, &c., v. Lisle, &c.

APPEAL FROM CLARK CIRCUIT COURT.

| 89 | 393 |
| 95 | 131 |
| 89 | 393 |
| 107 | 565 |
| 89 | 393 |
| e111 | 242 |
| 89 | 393 |
| 137 | 33 |

1. WILLS—UNDUE INFLUENCE.—Neither mere appeals to the affections nor arguments addressed to the understanding, even where effective, amount to undue influence in the meaning of the law; and to set aside a will on the ground of undue influence on the part of the devisees, it must appear that they exercised such dominion over the testator as deprived him of. the power to dispose of his estate in accordance with his own wishes, and in view of the claims of his other relatives.

2. SAME—TESTAMENTARY CAPACITY—EXPERT TESTIMONY.—It is only where there is doubt or contrariety of evidence in regard to the real state of the intellectual faculties of one whose mental capacity is in issue, that it is competent to show, by expert testimony, what are the usual consequences of physical infirmities and habits such as his. If the theories of experts are variant from the actual state or condition shown to exist, they are misleading.

3. SAME.—Where the will of one who was addicted to the use of morphine is sought to be set aside on account of undue influence, the fact that the ordinary effect of the use of morphine is to weaken the will power is immaterial, if the evidence shows that there was, in fact, no weakening of the will power, and no effort to influence or control the testator in the final disposition of his estate.

4. SAME—PRACTICE.—As the evidence shows clearly that the testator had testamentary capacity, and freely, and without influence, executed the paper in contest, the circuit court is directed to dismiss the appeal from the order probating the will.

W. M. BECKNER FOR APPELLANTS.

1. Although the testator was physically helpless, his mind was as bright as it had ever been. The proof shows clearly his capacity to make a will. (Harper's Will, 4 Bibb, 274; Reed's Will, 2 B. M., 79; Maupin's Ex'r v. Woods, 1 Duv., 223; Jones v. Jones, 14 B. M., 374; James v. Langelm, 14 B. M., 198.)

Testamentary capacity defined. (Wise, &c., v. Foote, &c., 81 Ky., 13.)

2. There is no proof of undue influence. Influence obtained by proper persuasion and argument, or by mere appeals to the affections, is not

Bush, &c., v. Lisle, &c.

undue influence, in a legal sense. (Wise, &c., v. Foote, &c., 81 Ky., 13; Sechrest, &c., v. Edwards, &c., 4 Met., 173; Broaddus' Devisees v. Broaddus' Heirs, &c., 10 Bush, 303.)

3. The testimony of the experts is at best of an exceedingly unsatisfactory character. Such testimony is often as much calculated to mislead a jury as to guide to a correct conclusion. (Russell v. State, 53 Miss., 365; Lawson's Expert Evidence, 240; Daniels v. Foster, 26 Wis., 686; Parker v. Johnson, 25 Ga., 585; Hays v. Wells, 34 Md., 513.)

4. The order appointing special sheriffs to summon jurors was prejudicial to appellants.

5. The court erred in refusing to allow appellants to recall the attesting witnesses to show that the testator was not under the influence of morphine, and was fully competent when he executed the paper in controversy. (Hunter v. Milton, 13 Bush, 163; Fee, &c., v. Taylor, 83 Ky., 261; Hawkins v. Grimes, 13 B. M., 270.)

6. This court should order the probate of the paper offered as the will of F. M. Lisle. (Broaddus' Devisees v. Broaddus' Heirs, 10 Bush, 299.)

WM. LINDSAY on same side.

Brief not in record.

BRECKINRIDGE & SHELBY and CHAS. J. BRONSTON for APPELLEES.

1. As important evidence heard on the trial is not in the record, this court will not reverse.

2. This court will not reverse, unless, on the whole case, it is convinced that the conclusion reached by the jury and the trial court is manifestly erroneous. (Smith v. Northern Bank, 1 Met., 579; Millet v. Parker, 2 Met., 613; Waller v. Logan, 5 B. M., 519; Tuder v. Tuder, 17 B. M., 388; Walrath v. Viley, 2 Bush, 478; Kennedy v. Commonwealth, 3 B. M., 330; Phillips' Adm'r v. Phillips' Ex'r, 81 Ky., 333.)

3. If every alleged erroneous decision had been otherwise decided, and all the excluded evidence admitted, there would have been no change in the case; the case as then made out would have been the same as the case now made.

4. For the refusal to permit witnesses to be recalled, there can be no reversal, unless there was a clear case of abuse of discretion. (Civil Code, sec. 600.)

The usual and proper course is to interrogate the subscribing witnesses as to the competency of the testator. (Milton, &c., v. Hunter, &c., 13 Bush, 171.) And this court will not reverse, merely because the propounders did not follow the usual and proper course.

5. If the court finds that there has been any error of law, which pre-
vented the appellants from having a fair trial, or that the weight of
the testimony does not justify the verdict, the utmost this court can
do is to remand the case for another trial. It must be an absolutely
clear case to authorize this court to direct the probate of the will.

CHIEF JUSTICE LEWIS DELIVERED THE OPINION OF THE COURT.

This is an appeal from a judgment rendered on ver-
dict of the jury finding a paper dated October 30, 1876,
and probated in the county court, not to be the true last
will and testament of F. M. Lisle, who died in Febru-
ary, 1879, at about the age of fifty-eight years, without
wife or child. He left no parents, his mother having
died before he did, though subsequent to the date of
the paper, those who would have inherited his estate
in case of no will being one brother, three sisters, and
children of each of four sisters who were dead. But
he devised, or attempted to devise, the whole of his
estate, of value about twenty thousand dollars, consist-
ing of choses in action, money and land, to his sister,
Minerva Bush, her four daughters and husband, Rob-
ert E. Bush, there being given to the last-named, who
was appointed executor, five shares of bank stock; to
each of the four nieces, specified land and money, and
to the sister the residue.

The grounds upon which the other heirs at law assail
the validity of the paper as a will, are want of testa-
mentary capacity and undue influence.

It appears that previous to 1866 the decedent had
been a professional gambler, but as the effect of syph-
ilis, contracted many years previously, from which he
never recovered, and probably of excess and dissipa-
tion, he became a wreck physically, losing his hair,

teeth, eye-sight partially, and use of his lower limbs to such an extent as to make crutches necessary for locomotion; and in that condition he went to the residence of a double cousin in Fayette county, Rufus Lisle, with whom he stayed until 1867 or 1868, when he removed to the home of Robert E. Bush, in Clark county, where he remained until his death, a room adjoining the dwelling-house having been constructed at his own instance and expense for him to occupy. Within a year or two after going to the house of his brother-in-law he became totally blind, unable to walk, and from his mouth, which was drawn out of its natural shape, offensive matter escaped. So he thereafter required and received from those to whom he attempted to give his estate the most assiduous, careful and affectionate nursing and attention.

He had, before going there, as relief from intense suffering in his lower limbs, contracted and continued to his death habit of using morphine, a comparatively large quantity of which he daily consumed. It farther appears, that during paroxysms of physical pain, he was excessively and offensively profane and blasphemous; and from these two habits, both mental incapacity to make a will and undue influence are sought to be deduced as existing facts.

There is no evidence whatever of unreasonable prejudice on his part towards any of the contestants; nor that he was swayed or prompted to abandon any fixed purpose, or to ignore any worthy or recognized claim on his bounty. On the contrary, ten years before the date of the paper, when his situation was less deplorable than it afterwards became, and when there is no

evidence he was not entirely rational, he offered to give his whole estate to his cousin, Rufus Lisle, to secure a home and needful care and attention while he lived; and the disposition he finally made of it was consistent, natural and commendable, because intended as a grateful recompense, no more, probably, than adequate, to those who did minister to him in affliction.

The person who wrote the paper testifies, that besides himself no one was present; that the decedent was in full possession of his mental faculties, and without aid or suggestion dictated the paper as written; and the provisions of it show, not only a preconceived and fixed plan for disposing of his estate, and full knowledge of the character and value of it, and the persons to whom it was left, but unusual intelligence of the legal effect of restraints and limitations put upon the devises to his nieces. Of the very large number of witnesses who testified on the trial, but three express any doubt of capacity of the decedent to make a will. One of them, who is a contestant, stated, as his opinion, that he did not think a man could be a sane man who used blasphemous language towards Jesus Christ. Another, who visited him as a physician once or twice, expressed the opinion he did not think a person who used morphine and whisky as decedent did was capable of taking into consideration his property and relations and making a fair, just and equitable disposition of his property, though he does not undertake to say what quantity of either he was in the habit of using, nor what his mental condition actually was when the paper was written, nor when it was, two days afterwards, signed and acknowledged;

and the third, who once saw him while in a paroxysm of pain, testified his professional opinion to be, that no man who had been an invalid for a number of years, and under influence of morphine for such length of time, is competent to transact business. But neither one of those three witnesses, nor any one else, throughout the entire trial, testifies to a single irrational act or speech by the decedent, or even profane language when he was not for a time racked with pain, with the single exception of J. B. Lisle, the principal contestant, who refers to one trivial remark, about which it was shown by another witness he evidently misunderstood the decedent. On the contrary, those acquainted with him testified he possessed a clear, vigorous intellect and strong will, which continued, when he was not in a sleepy state from use of morphine, up to his death. And it clearly and fully appears, that from the time he went to the home of Robert E. Bush to the date of the paper, and even afterwards, he transacted business, loaning money, buying land, keeping account of interest and dividends on stocks due him; was consulted by his friends about business matters; discussed politics, banking and neighborhood affairs with perfect intelligence, and kept full control of his estate, so that when he died there had not been any part of the principal consumed, nor any of his income wasted or disposed of at all, except with his consent and full knowledge. It seems to us, as the record stands, there is a total failure by the contestants to show lack of mental capacity on part of the decedent to make the will, and, in our opinion, evidence of undue influence by the devisees, or any other person, is equally unsatisfactory,

and the verdict of the jury can be accounted for only
on the supposition their attention was diverted from
facts proved to abstract theories of physicians who
never examined nor had knowledge of the actual
mental condition of decedent when the paper was
executed.

It is needless to refer in detail to the testimony of
the learned experts, because there was such an agree-
ment in their statements as to make reference to the
evidence of one suffice for all. The general conclu-
sion drawn from the hypothetical case assumed by
them is, that the brain of a person who has syphilis
in tertiary form is likely to become more or less af-
fected, and that a person in the condition the dece-
dent was shown to be in, if confined in the same
family eight or nine years, taking morphine habit-
ually three or four times per day, administered by
members of that family, would have no capacity to
make a will, or do any thing which he believed would
be contrary to the wishes of such family, and would
seek by every means to please them, although he, at
the same time, might talk intelligently, and impress
an ordinary observer as being exceedingly bright. It
seems, however, to be conceded by the experts that
the use of morphine does not necessarily impair the
intellectual faculties, and, consequently, their evi-
dence, if pertinent in this case at all, has relation
alone to the question of undue influence.

Expert testimony is worse than useless, it is mis-
leading, when given on a subject about which there is
proof so convincing as to leave no reasonable ground
for dispute, or when variant from the actual state or

condition shown by positive evidence to exist; and no conclusion reached by a mere theorist, however learned, can be reasonably accepted and applied in any case without being founded on and consistent with the facts as they are found to be. If there had been doubt or contrariety of evidence in regard to the real state of the decedent's intellectual faculties, it might have been pertinent to show by experts what are the usual consequences of physical infirmities and habits such as his. But it does not appear his mind was impaired or affected by the disease he was afflicted with, nor that he was dependent upon Robert E. Bush or any of his family for morphine; nor was their aid in procuring it or permission to use it ever sought by him. On the contrary, he had an estate sufficient to gratify every wish and supply every want, the character and value of which he well knew, and the management and control of which he kept without dispute or question till his death; and the morphine used by him was purchased with his own means and at his own pleasure without hindrance or protest from any one; and whatever may be the ordinary effect of use of morphine, the evidence in this case does not show any weakening of the will power of the decedent, nor the slightest effort on the part of any one of his devisees, or other person, to influence or control, by coercion, argument or persuasion, the final disposition of his estate, nor that he was influenced to dispose of it as he did do by any other reason, motive or feeling than gratitude to and affection for Mrs. Bush, who was his favorite sister, as shown by two previous wills, in one of which he gave his estate to her and a brother,

since dead, and in the other the bulk of it to her, and by the significant fact that when he became a helpless and doomed invalid, he selected her of all others to nurse and care for him.

There is some evidence tending to show her anxiety about the manner in which he would dispose of his property; but none that she or any one else attempted to influence him in regard thereto, by importunity, persuasion or even suggestion. In two instances she interfered to prevent gifts by him to other persons, one of them being a drunken man and the other a lewd woman, a former mistress, to whom he had previously given money, and who was endeavoring to obtain more.

It also appears he was unwilling for his sister to leave him, and some of the witnesses quote her as saying he displayed weakness by shedding tears when she did go away from home, leaving him to the care of others.

But there is no evidence showing, or from which it can be reasonably inferred, that any of the devisees acquired such dominion or influence over him as deprived him of the power to dispose of his estate, in accordance with his own wishes, and in view of the claims of his other relatives, and without the existence and actual exercise of such dominion, as has been often held by this court, he must be regarded as executing the will without undue influence. For neither mere appeals to the affections, nor arguments addressed to the understanding, even where effective, amount to undue influence, in the meaning of the law. There was, however, according to the evidence,

402        KENTUCKY REPORTS.        [VOL. 89.

Conley's Adm'r v. Cincinnati, New Orleans and Texas Pacific Ry. Co.

no other influence exerted, or appeal made by the dev-isees, than such as affectionate care and attention afforded, which the law upholds rather than condemns.

In our opinion, the evidence in this case shows clearly that F. M. Lisle had testamentary capacity, and freely, and without undue influence, executed the paper in contest, and it should be held his true last will and testament.

Wherefore, the judgment must be reversed; and as the verdict is not sustained by the evidence, the cause is remanded, with directions to the lower court to dismiss the appeal from the order of the county court probating and admitting to record the paper as his will.