*In re* EMMONS' ESTATE.

EMMONS *v.* EMMONS.

WILLS—MENTAL COMPETENCY—PECULIARITIES OF TESTATRIX—EVIDENCE—SUFFICIENCY.

In the contest of the will of a woman about 80 years of age on the ground of mental incompetency to make same, evidence of peculiarities on the part of testatrix, *held,* insufficient to go to the jury in the absence of proof that they in any wise affected the provisions of the will.

Error to Kent; Perkins (Willis B.), J. Submitted April 12, 1922. (Docket No. 57.) Decided July 20, 1922.

The question as to what constitutes capacity or incapacity to make a will, see notes 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

Byron Emmons presented for probate the last will of Hannah Emmons, deceased. The will was allowed in the probate court, and Eugene Emmons appealed to the circuit court. Judgment for proponent on a directed verdict. Contestant brings error. Affirmed.

*Willis B. Perkins, Jr.*, for appellant.

*George C. Brown*, for appellee.

BIRD, J. This is a will contest in which defendant, Eugene Emmons, contested the will of his mother, Hannah Emmons. The will was offered for probate by Byron Emmons, the executor named in the will. The will was sustained by direction of the trial court. Contestant is here insisting that the question of testatrix's mental competency should have been submitted to the jury.

The testatrix and her husband were farmers for many years in the county of Ottawa. In 1896 they moved to Grand Rapids. Mr. Emmons died in 1910. He left an estate consisting of real and personal property of about the value of $14,000. This was left to Mrs. Emmons. After Mr. Emmons' death the testatrix continued to reside in the old homestead and remained there until she died in 1919. They had two children, Byron and Eugene Emmons.

Testatrix made the will in question in the year 1914. She was then about 80 years of age. The will was drawn by Mr. F. P. Geib, a very reputable and conpetent attorney of Grand Rapids. The will, with the formal parts omitted, is as follows:

"(1) I direct my executor hereinafter named to pay out of such estate as I shall leave, all of my just debts, funeral expenses and expenses of my last sickness.

"(2) I bequeath to my son, Eugene Emmons, of the city of Grand Rapids, Michigan, the sum of five hundred ($500) dollars.

"(3) I bequeath to my granddaughter, Mrs. Myrtle

Linder, of the city of Grand Rapids, Michigan, five hundred ($500) dollars.

"(4) All the rest, residue and remainder of my estate of every description, I give, devise and bequeath to my son, Byron Emmons, of the city of Grand Rapids, Michigan.

"(5) I hereby nominate and appoint my said son, Byron Emmons, to be the executor of this, my last will and testament."

The probate of the will was resisted by Eugene Emmons, on the grounds of mental incompetency and undue influence. There was no testimony that testatrix was unduly influenced to make the will and that defense is not insisted upon in this court. Counsel for contestant argues but one question, namely: That he had a right to go to the jury on the question of the mental competency of testatrix.

Several witnesses testified on behalf of contestant. They were mostly acquaintances who had known Mrs. Emmons since she came to Grand Rapids. Several of them were old neighbors. They ventured the opinion that Mrs. Emmons was mentally incompetent to execute the will in question. Several of them stated no facts which would entitle them to express an opinion on that question. Some of them based their opinion upon certain peculiarities of Mrs. Emmons. All of them referred to the fact of noticing a gradual decline in Mrs. Emmons after her husband died. The peculiarities referred to by several of the witnesses were that she would hide her pocket book and then forget where she had hidden it. On one occasion she was unable to find her pocket book and caused the arrest of a man who had been working at her house. Afterwards she found it and the man was released. That she had the habit of hiding fruit until it became mouldy and decayed. That a part of the time she kept milk and butter in the parlor. That on one occasion she mistook a water hydrant on the

opposite side of the street for a young boy. That on other occasions she insisted the government issued a $24 bill. It also appeared that the testatrix at times was confused and would get lost when near home. These things, together with the fact that she was gradually declining as age advanced, furnished the basis for the opinions that she was mentally incompetent.

Beside the witnesses who testified in behalf of her competency, it was shown that in 1911 the administrator of her husband's estate turned over to her nearly $14,000. This consisted of real estate, mortgages, bonds, bank accounts, etc. She took charge of and managed the estate so prudently that when the guardian was appointed for her in 1917 she turned over to him nearly $500 more than she had received in 1911. During this time she sold real estate, collected rents and interest, paid taxes and household bills. She had two savings accounts and kept the certificates renewed. Most of the time she lived alone and attended to her household affairs. For a season Byron and his wife lived with her. She grew to dislike Byron's wife. She wanted them to leave. They refused to do so. She went to an attorney and caused summary proceedings to be commenced against them. In this connection she left $100 with the attorney to cover Byron's moving expenses. She stated to him that she did not blame Byron but expected him to stand by his wife.

Just before she made the will in question she arranged the details for a small cancer to be taken from the side of her nose. The operation was successful and pleased her very much. When she made the will in question her granddaughter went to the office of the attorney with her but did not remain. Mrs. Emmons dictated the provisions of the will and Mr. Geib put her wishes in legal form. He testified that she ap-

peared to know just what she wanted to do except that she hesitated some as to the exact amount of the legacy she would give to her grandchild, the daughter of contestant.   Upon cross-examination the grandchild testified as to the making of the will, as follows:

"*Q.* Will you point out something in what you have related here about the transaction that indicated to you that she did not know what she was doing in reference to the making of this will?

"*A.* Well, I could not tell about this transaction, but I can tell other little things.

"*Q.* I am talking about this occasion and about her action in making this will.   Will you point out something that indicated to you that she did not know exactly what she was doing?

"*A.* I could not tell.

"*Q.* Every step indicated to you that she knew exactly what she was doing?

"*A.* Well, I do not know what was going on inside, what she related in the office.

"*Q.* I did not ask you that.   Every step that you came in contact with indicated to you that she knew exactly what she was doing?

"*A.* She knew she wanted to make one.

"*Q.* That does not answer the question.   Every step that your grandmother took, the coming down town and going away, indicated to you that she knew exactly what she was doing?

"*A.* Well, yes.

"*Q.* Can you mention any single item in connection with   the making of that will at that time now that indicated to you that she did not know exactly what she was doing?

"*A.* No.

"*Q.* Not one thing?

"*A.* No."

And contestant himself testified that when he visited his mother she appeared to be perfectly rational.

We are not impressed that the peculiarities recited are of much force.   What force they did have are broken by the fact that most of them were noticed

after 1914, the year in which she made the will. But if she had all the peculiarities when she made the will, there is no showing that they in any wise affected the provisions of the will. Unless there is some proof that they did they would not be important.

In *Rice* v. *Rice,* 50 Mich. 448, it was said:

"After the full examination of the general subject of testamentary capacity in the case of *Pierce* v. *Pierce,* 38 Mich. 412, and *Fraser* v. *Jennison,* 42 Mich. 206, we do not deem it necessary to enlarge upon it here. But we repeat what we have said in substance in those cases, that a will is not to be set aside merely because the party making it was weak, or sometimes foolish, or lacked the average mental capacity of his neighbors, or did not dispose of what was his own as others who could know nothing of his reasons might think he ought to have done, nor necessarily because he was subject to delusions, when it is manifest that the delusions did not affect his gifts."

See, also, on this question, *In re Walz's Estate,* 215 Mich. 118.

The will was short, plain and simple in its provisions. It does not appear to have been affected by any of the peculiarities which were shown. If the testatrix could so manage the estate as to increase it between the years 1911 and 1917, and in addition thereto care for her own household, it is quite evident that she had mental capacity sufficient to execute such a will as the one in question. See *Phelps* v. *Beard,* 209 Mich. 266.

We are of the opinion that the trial court was right in holding that there was nothing in the proofs to submit to the jury on the question of her mental incompetency.

The judgment is affirmed.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, SHARPE, MOORE, and STEERE, JJ., concurred.